May it please the Court, my name is Amy Oliver. I am appellate counsel for the Valencia family. Examining all the evidence below, it clearly compels the finding that the Valencians established a well-founded fear of persecution on account of the Mormon religion and that the government failed to meet its burden to rebut that presumption. Initially, all of the evidence below shows that the Valencians were persecuted on account of their Mormon religion. Indeed, the government does not dispute this. This strikes me for once among the cases this morning, this is not a credibility question. It is not. If the testimony is credible, what does it amount to? What does it mean? That's correct. The immigration judge determined that the family was credible in their testimony and this is really a case about the evidence below. Continuing at the evidence below, it is clear that the Mormon religion was the trigger for all of the persecution suffered by the Valencia family. Specifically, Javier and his gang verbally assaulted Maria and Victor as well as other members of the church. Javier and his gang also threw stones at the church members as well as at the church building. The gang physically assaulted Maria while she was carrying her infant son, at the same time threatening her that if she continued to go to the Mormon church, that they would kill her. And Victor was also physically assaulted. He was brutally attacked, hit upside the head, knocked to the ground, beaten, and ultimately stabbed in the chest. All the while, while Javier and his gang threatened him that if he continued to go to the Mormon church, they would kill him. The message of the gang was clear to Maria and Victor. Continue to go to the Mormon church and we will kill you. Assume for the moment, although we can back up and question it, assume for the moment that a sufficient amount of the motivation for this behavior is hostility to their going to the Mormon church, rather than jealousy of the woman who bore his first child and so on. So assume the motivation is sufficiently tied to the Mormon church. How does that become a protected ground in the sense of involvement of the Well, in examining the evidence below, to establish that you have a well-founded fear of persecution, you can do so by showing past persecution. Here the Valencia family did so on account of religion. Then they must also show that the Mexican government was either unwilling or unable to control Javier and his gang. That's that last point I'm interested in for the moment. Yes, the evidence below clearly shows that the Mexican authorities did nothing to control Javier and his gang. Maria testified that they reported these assaults to the Mexican authorities. She testified that she continued to see Javier and his gang on the streets, that she saw Javier socializing with the local Mexican authorities, and she testified that the Mexican authorities were corrupt. Indeed, the immigration judge interrupted her testimony to indicate that the government's evidence, the State Department report, corroborated her testimony that the local Mexican authorities were corrupt. There's simply no evidence in Maria's testimony that the government took no action to protect them from Javier and his gang. What do you do with the fact, I mean, how does it then cut that Javier has previously been in prison? So it's not as though he's sort of solely in league with the authorities that they won't do anything to him no matter what he does. Well, if you look at the record, his previous prison time was approximately four months, and it was four crimes committed before. But if you look at the crimes Maria reported him for to the police, these included not only the assaults on her family, but also some crimes that she was aware of due to this prior relationship, including murder, robbery, and drug dealing. It's not disputed that the Mexican government took no action against any of those crimes to protect the Valencia family, and that they did nothing to investigate the claim, to charge Javier with this assault or any such thing. And all this took place in Mexico City? It did, Your Honor. And what do we have in the record with respect to why they can't go to Guadalajara or something? This sounds like a localized problem with Javier and his gang. Certainly. I understand that, Your Honor. Assuming, and we believe this is true, that the Valencia family has established that they have a well-founded fear of persecution on account of the Mormon religion, the burden then shifts to the government to rebut that presumption. The evidence presented by the government below does not rebut that presumption. This court held in Melkonian v. Ashcroft, that is not the burden of the applicant to show countrywide. I believe the government's brief says it's safe to relocate within another state of Mexico. Their evidence does not show that if you examine the evidence below, Your Honor. Nothing in the record to support the government's argument? Their evidence does not show that, no, Your Honor. Nothing in the record? No, looking at their evidence. Any evidence? Any evidence. Okay. And I'd like to address that evidence specifically. I'll begin with the State Department report. They point to the State Department report on religion that states that religious persecution occurs in two localized areas and that relocation is almost always an option. However, if you examine the actual State Department report, it discusses only the persecution of Evangelical Protestants and Jehovah's Witnesses in two small communities in Mexico. It does not address persecution on account of the Mormon religion nor does it address persecution in Mexico City, the largest city in the country. It simply does not show that the family could have relocated within Mexico or, more importantly, that it was reasonable for them to do so. The government next points. Is there any evidence one way or another as to whether other members of the Mormon church to which the state to which this family belonged was sustaining the same kind of conduct? Maria testified that other members of the church were verbally assaulted by the gang, that they were also stoned by the gang when they attempted to go to church, and that Victor's parents, who were also Mormon, were harassed and assaulted by Javier and his gang. The government points to the testimony that Victor's family had relocated to the state of Hidalgo to support their contention that the family could have relocated. However, Maria testified that there is not a Mormon church in Hidalgo, nor are there any Mormons present in that town, and it's simply not reasonable to expect the Valencia family to relocate to a town where they cannot practice the very religion. But there is some evidence that Mormons can relocate safely. I'm sorry? There is some evidence that Mormons can safely relocate. I don't believe the evidence below is sufficient to show that, Your Honor. Okay. And I'd like to address the remaining pieces of evidence the government points to. They point to a news article from the Mormon church indicating that the government has granted them the right to own property. The government makes no individualized analysis of this evidence to show why it would indicate any relevance to the Valencia situation. It's simply irrelevant whether the Mormon church can have legal title to buildings and property located in Mexico. The government also points to the fact that Maria returned briefly to Tijuana and gave birth in 1989. The mere fact that she returned on a brief period to a border town where she gave no evidence of permanent relocation does not support that it would be reasonable for them to relocate. Javier had close ties with the police in Mexico City, and it's simply not reasonable to expect them to move somewhere else in Mexico that the government has shown. In your opening brief, did you challenge the alternative holding of the immigration judge that relocation was possible here? Your Honor, I believe we did. I would point you to pages 9 and 10, 17 and 26 of the brief, and also contend that, as we pointed out in our reply brief, we had challenged the immigration judge's determination of whether or not we had established a well-founded fear, and under the Melkonian v. Ashcroft case, relocation is a factor for the immigration judge to determine in making that decision, and we believe we adequately raised that issue. I'd like to reserve the remainder of my time for rebuttal, if I may, but if you have a follow-up question I'd be more than happy to answer. Thank you again, Your Honors, and good morning again. John Cunningham for the Attorney General, who may have pleased the Court. The issue of safe relocation and unable or unwilling to control are interesting issues in the context of this case, and I am looking forward to discussing it with you, but we do have a waiver argument in this case, as Judge Alarcon has pointed out. It's our contention that the petitioner's opening brief did not challenge the immigration judge's finding that the petitioners could safely relocate outside Mexico City and get away from Javier and his gang, and since that is a dispositive conclusion in an asylum case, we believe your analysis of this case should stop at that point. I'll note that for the record and go on to discuss it, because this is interesting, and this is a case where, I mean, to my mind, the unable or unwilling to control doctrine does bleed into the safe relocation doctrine, because they both speak to the same thing. Is this petitioner truly a refugee? To be a refugee, you must be unable or unwilling to avail yourself of the protection of your home country. And if you are being pursued by someone whom the government is unable or unwilling to control, then you are unable to protect yourself of the – of your – to avail yourself of the protection of your home country. And by the same token, if the evidence shows that you could safely relocate, then you are not a refugee from your country. You are perhaps a refugee from some part of your country, but the asylum law does not stretch to cover that kind of circumstance. Here the evidence showed that after Mrs. Valencia left Mexico and came to the United States, her in-laws, her husband's parents, left Mexico City – and the record is clear they did so to get away from Javier and his gang – and moved to Hidalgo. When she testified, Mrs. Valencia said, well, Hidalgo is a very small state. It's quite close to Mexico City. It's only an hour's drive away. And obviously that testimony was meant to shore up the notion that Javier could find the family in Hidalgo as well. When her husband testified, he said, well, no, Hidalgo's a very large state, and it's three or four hours away, and – and he – and – which, of course, is contradictory to his wife's testimony, and he also said that Javier had never contacted his parents in Hidalgo. My colleague's response to that is, well, there are no Mormons, there are no Mormon churches in Hidalgo. I'm not sure that's quite enough to get you out of the safe relocation problem, and I don't – I don't – I don't want to stand here and say that it would be reasonable to expect someone to go where you cannot practice your religion. That would – that would not be correct. But the – there's a document in the record from the Church of the Latter-day Saints website that shows there are 800,000 Mormons in Mexico as of the close of this record. There is a clear policy of nondiscrimination against Mormons on the part of the national Mexico government. And Mr. Hidalgo testified that other relatives of his who are also Mormons worship at a church on the outskirts of Mexico City. So it is possible to go outside Mexico City and find a Mormon church. And Mrs. Valencia said – she was asked, do you know if there are other Mormon churches that you could go to in Mexico? And she said, I don't know. I never looked into that. I just don't know the answer to that question. But on the basis of this evidence, the immigration judge – and again, we urge you not to reach this point – the immigration judge was on solid ground in concluding that these petitioners could safely relocate in Mexico to get away from Javier and his gang. This case does stretch the borders of who is a persecutor and who is an entity that the government is unable or unwilling to control because this is really just a local crook. He's a thug. He's a street thug. He's violent. He's a rotten person. And he was – he acted reprehensibly toward these petitioners. But that's all he is. There is a claim that the local police were unable to control him or were unwilling to control him. My colleague this morning used the word socialized. I didn't see that in the record. The basis for that claim was testimony from Mrs. Valencia that she saw the police talking to Javier. Well, police talk to people who they suspect of committing crimes. We do have record evidence that Javier has been in prison. It's not as if the immigration judge was compelled to find, which of course is your standard of review, that Javier could operate scot-free in Mexico City. And even if he could, even if he could, this is not a persecutor within the bounds of this Court's case law. This is not a government persecuting. This is not a nationwide guerrilla group such as the New People's Army in the Philippines or the Shining Path in Peru. This Court has cases which have held that in situations like that, safe relocation is not viable. This is a localized problem, a purely localized problem, and there was certainly plenty of record evidence to support the notion that these petitioners had options available to them to get away from that localized problem. That concludes my remarks on the merits of the case. There was a due process issue raised in Petitioner's Brief, which I haven't heard my colleague discuss this morning. It involves the immigration judge's refusal of a continuance to my colleague's precedence during the hearing. I'm prepared to discuss that with you if you wish, if you have any questions on that point. My only comment on that is if you review the evidence of the – if you review the transcript of the hearing, this is at pages 152 through 215 of the record, you will see no evidence that my colleague's predecessor, Ms. Hubbard, raised any contention before the immigration judge that she was not prepared to go forward with the hearing or that she had other witnesses that she needed to present and she needed another hearing to do that. In fact, at page 210 of the record, she said to the immigration judge, Your Honor, I rest my case. There's just no evidence here that the immigration judge's refusal of a continuance two weeks before the hearing had any impact whatsoever on Ms. Hubbard's ability to fully represent her client. If there are no further questions, I will thank the Court for its attention and bid you good morning. Thank you. Ms. Oliver, you've saved some time. Ms. Oliver, I want to go back to my question. Maybe I didn't phrase it properly. Okay. I meant to ask you, in your opening brief, did you discuss the issue of relocation? You cited me to page 9 and 10. Yes. But that's not in the opening brief, is it? Yes, it is. Read the language in the opening brief that discusses relocation. Sure. I will read all the language that I'm speaking of. All right. On the concluding sentence on page 9, it states that during Mr. Javier's reach within Mexico, they did not feel safe simply relocating within the country. And it goes on on the next page to discuss how Victor's parents, who are also Mormon, have relocated to another city, raising the issue there of relocation. And then if you turn to page 17, you'll see we address the evidence presented by the government. And in the middle of that page, we state that the INS may rebut the presumption by showing that the conditions have changed. However, the rebuttal evidence must somewhat fit the facts, and it is this evidence that the government presented in support of their contention that they could relocate. So I do believe that we have not waived that issue. Okay. Thank you. I would just point out to the Court that it is the government's burden to bear to show that a victim of persecution could reasonably relocate within their home country under this Court's decisions in Singh v. Ilchert and Milconian v. Ashcroft. The evidence set forth below simply does not show that it was reasonable to expect this family to relocate. And you're liking my opinion in Milconian. I certainly am, Your Honor. Maybe I made a mistake in that opinion, too. Who knows? I would not assert that you did, Your Honor. Don't worry about Judge Fletcher going both ways at the same time. It doesn't happen. All basketball players can go both ways. Exactly. I would address only the argument that the government made regarding whether or not Javier and his gang qualify under the Unable and Unwilling to Control. If you refer to this Court's decision in Novice v. INS, it held that government action is not necessarily required. Police inaction in the face of persecution is all that's required, and that's clearly what we have here below. Again, I would just say in conclusion, looking at the evidence below, it is clear that the Valencia family was persecuted on account of their religion, that the Mexican authorities did nothing to control that gang and to protect the Valencia family, and that the evidence presented by the government was simply not sufficient to carry their burden, that it was reasonable to expect this family to relocate internally. Thank you. Okay. Thank you very much. Thank you for a very nice presentation in this case on both sides. Thank you. The case of Valencia Vieda is now submitted, O2-73932, submitted for decision. And the last case on the calendar, Martinez v. Ashcroft. Thank you. Thank you.
judges: Alarcon, Beezer, W. Fletcher